Thank you, Judge Páez, and may it please the Court. The District Court in this case recognized an unprecedented right under California law to the public performance of sound recordings made more than 40 years ago and then held that this right operates without regard to whether or not the sound recordings have been commercially distributed to the public at large. There are four fundamental problems with the District Court's decision. The first is that it directly contravenes this Court's decision in the Lone Ranger case, which held that any copyright protection that existed in pre-1972 sound recordings under California law is lost when the sound recordings were commercially distributed, as the recordings at issue in this case indisputably were in the 1960s. The second problem with the District Court's decision is that it's directly contradicted by this Court's recent decision in the Madonna case. What's the case? The Madonna case, Your Honor, the VMG case. In that case, this Court, in interpreting the identical language of the Federal Copyright Act, held that the broad recognition, that the recognition of rights in one part of the statute can't be read to include all conceivable rights simply because there's an express exemption for cover songs. And that was the District Court's exact reasoning in this case in interpreting Section 980A2's reference to exclusive ownership to mean all conceivable rights simply because the statute expressly exempted cover songs. And that reasoning, the heart of the District Court's interpretation of the statute here, was directly refuted by this Court's decision in the Madonna case, interpreting directly and how this thing... So, you know, I've read, I've read quite a bit. There's a lot of paperwork in this case, and I've read quite a bit. But I want to, I want to make sure that when you leave here that I have a full understanding of your argument here. And I'd like for me, it would help me if you would focus for a minute on what the legislature was up to when it amended the statute. Sure. And what the legislature said, the legislative history set forth in the appendix makes this clear, is its intent was to conform state law with the recent amendments to Federal Copyright Law, the 1976 Act, and that its intent was to maintain existing rights, not to create new ones, and certainly not to resurrect old ones. So what did it mean when it said it wanted to conform state law with Federal Copyright Law? Well, one of the things that section, that the 1976 Act, the Federal Act did, is it essentially abolished state protection for unpublished works, so that going forward from 1976 forward, Federal Copyright Law would apply to unpublished as well as published works. And what that meant, for example, was that the provision in 983 of the California Code, which was the divestiture by publication rule, once you publish the work, you lose any protection in it under California law, was no longer necessary, because going forward you weren't going to have this distinction between unpublished and published works, Federal Copyright Law, preempted state law going forward on that basis. So that was the reason why they took away 983. But the overwhelming... But when they did that, they also amended 980, right? Well, what they did in 980 was to say that they had a reference to exclusive ownership to sound recordings before 1972. But the plaintiff's theory in this case is that that amendment, which essentially carried forward the language that had existed in California Copyright Law for more than a century, exclusive ownership, and simply preserved the rights that existed in pre-1972 sound recordings, somehow drastically expanded the rights that existed under California law to include not just the right against reproduction or distribution of sound recordings, but this brand new right of public performance. And that was a right that no one had asserted in California that hadn't been asserted nationwide. I mean, I think it's important to understand that over... But if you look just at the plain words of the new 980A2, why is their argument a silly argument? Well, Your Honor, it doesn't work. And we think it's silly to borrow Your Honor's phrases, because what the statute says is it refers to exclusive ownership. That's the phrase that they hang their hat on. That tells you that what they own is exclusive. It's not joint. But it doesn't tell you what they own. It doesn't tell you what's in the bundle of rights. And so what the district court reasoned was because the statute then goes on to say, well, cover songs are exempted, then invoking the expressio unius principle of construction, it said because they explicitly exempted cover songs, the legislature must have intended ownership to include everything else, not just the right of public performance, but it also would override the fair use doctrine, the first sale doctrine. It would have made every used record store in California a criminal enterprise on the day that the statute was passed. And that's the very reason that the Ninth Circuit has rejected most recently in the Madonna case. It doesn't work at all. So then the question is, what do they have exclusive ownership to? And as in any other context of statutory interpretation, you'd looked at that in the context of history. You would look at the legislative intent. And here, what we know from the legislative intent is that the intent here was to maintain existing rights. There was no known opposition to this bill, even though for decades prior to this, there had been an all out war being waged in legislatures and particularly the Congress. Go ahead. Between the record labels and broadcasters over whether there should be a public. Then what does 980A1 protect? Well, that's not pertaining to the sound recordings, Your Honor. That's. I'm sorry, 180A2. I'm sorry. Well, what it did is carry forward for unpublished works the rights that existed before, which is the right against reproduction. I mean, that's going back to Judge Leonard Hand had recognized that in the Whitening case, that there was a right against. That was overruled eventually by the same court, right? The Second Circuit overruled Judge Hand's decision and Judge Hand was on the panel that overruled him. Right. So there are two components of the Whitening decision, though. One is a recognition that the copyright protection that existed in sound recordings was a right against reproduction. And then the other was that any rights that existed was lost through publication. That the subsequent Second Circuit panel overruled the divestiture by publication. They didn't question that the only rights that existed were a right against reproduction. And that, of course, has always been the way it's understood. It's why broadcasters have always been required to pay since federal law in the early 19th century royalties on the musical composition, the notes and lyrics, but have never been required to pay royalties for the public performance of the sound recordings themselves. I mean, the plane of theory here is that hundreds of millions, if not billions of dollars of royalties went unasked for and uncollected over the course of time. Since the advent of radio. And I also think it's important to appreciate in this case is what Pandora does is directly akin to traditional radio broadcasting. All that Pandora's services do not involve any on-demand service. They do not involve interactive services. They simply select songs and play them in the same way that a traditional radio broadcast would. In fact, there are strict limits. It's not available to everybody, though. Well, right, it's available over the Internet to users, but what users can't do is they can't download songs. They can't copy songs. There are direct restrictions on that. In fact, if you go to Pandora and you want to hear music from a particular band, you type in the Beatles, there are restrictions. You cannot pick the song that that you'd like to hear, but you could hear a Beatles songs and you would hear other music. And there are restrictions under federal law that over the course of three hours, Pandora is restricted. It can only play four songs from the Beatles and not even entirely back to back. So so Pandora is operating exactly like a traditional radio broadcaster. It is it lawfully purchases the music, it broadcasts the music, it pays royalties on the musical composition under federal law for all recordings. With respect to recordings after 1972, it does it does pay royalties on the sound recordings under the Digital Performance Right Act, federal law. But there has never been any right of public performance to sound recordings under California law. That right has simply never existed. And if it did exist, it was lost when the recordings at issue in this case made by the Turtles were commercially distributed when the Turtles sold the records in the 1960s. This court's decision in the Lone Ranger case is a complete answer to that. The court in that case recognized that the very provisions that it were in effect at that time, Section 980 and 983, operated so that when when the broadcasts in that in that case were commercially distributed, the the rights holders lost copyright protection under California law. That interpretation of state law is binding on this panel, just like an interpretation of federal law would be. The only exception that this court has recognized is when there's intervening authority of the state high court or at least extensive authority of the intermediate court. And here, plaintiffs can't point to a single decision from the California Supreme Court or a California intermediate court that that overrides or disagrees with the Lone Ranger decision. So that divestiture by publication eliminates the copyright argument in this case. This statute, though, has not been interpreted by the California courts. And one of your alternatives is to send it, certify it and send it to them. And I have a couple of questions that relate to that. First of all, there's parallel litigation going on before the same judge in the case by Flo and Eddie against Sirius. That case was scheduled for trial in November. They're now in settlement discussions. And maybe. So is it possible that in the course of the settlement, there will be some sort of a declaration, announcement that could affect the interpretation of the statute or could affect this case? So that's question one. And maybe that's speculative. But question two is you got here and what something that's sort of akin to or get to to preliminary injunction, the anti-SLAPP statute. And under the anti-SLAPP statute, all that a plaintiff has to show is minimal merit. Minimal merit is less than what you'd have to show on an injunction. And if the plain language supports them, if we don't look at legislative history, haven't they done enough to let it go back to the district court and say you haven't they've satisfied their burden under the anti-SLAPP statute. And now go ahead and proceed with this case, just like you're proceeding with the Sirius case. I've asked you a lot of questions at once. I'm sorry. Fair enough. First of all, with respect to the Sirius case, my understanding is it has been settled. But either way, there's nothing that Judge Gutierrez could say in that case that would change this court's duty to follow a Ninth Circuit precedent or change state law as a federal court. So I don't think that that changes anything. Second of all, with respect to the anti-SLAPP statute, there's two elements of that. First, we have to show that this case involves expressive protected conduct. And I don't think it can be seriously disputed that the selection and broadcast of music that everybody agrees is culturally valuable is protected conduct within the ambit of the California anti-SLAPP statute. At that point, the burden shifts to the plaintiff to meet the merits inquiry, to show that there is a reasonable probability of prevailing. And what the California Supreme Court has held is that is a summary judgment-like determination. And, you know, particularly in a case like this, where our legal arguments were made in the context of a 12b6 motion to dismiss, there are no disputed facts before this court. It's a pure question of law as to whether or not their claim can proceed or has any basis in California law. That's a pure legal determination. They have to show that they have a reasonable probability of prevailing on it. They can't possibly do that. I mean, first of all, Lone Ranger establishes that when they sold the records containing the sound recordings at issue, they lost any protection that they had under California. Well, they claim they got it back. Well, and that's right. But but, you know, with respect, that's exactly the kind of argument that this court can reject as a matter of law. The basis for that argument is, is that when the California legislature in 982 repealed in 1982, repealed Section 983, that this protection somehow sprang back into existence. Now, it's an extraordinary thing for legislature to take works that have entered the take them outside of the public domain. Here, there's absolutely no indication that the California legislature intended to do that. Instead, there's just the opposite, which is that the California legislature made clear that its intent was to maintain existing rights. And that's perfectly consistent with the fact that there was no known opposition to the bill. And this isn't something that just would sort of slide under the radar here. I mean, if you look at the historical context here, again, there have been battles fought in the legislature, particularly in Congress, even a even a two year strike by artists against recording labels that was of the highest profile over these rights. And yet it was always understood that that the artists and the labels did not have a right of public performance and sound recordings. Their protection was limited to royalties on the musical compositions, which in many cases would be for the artists themselves. Now, let me ask you one other thing before we sit down. Do you want did you want to say some time for me? I would. I would. Let me ask you. So Judge Gutierrez did something else. He sort of in evaluating what rights were protected, I think it was under 980 under the statute in under a two. He also took a look at other aspects of California common law and said, well, you have to look at these other the way California courts have looked at these treated these kinds of claims and under other theories. And he said, surely they those notions should be considered in the bundle of protective rights that were established by 980. Right now, you're absolutely right, Your Honor. You look what was wrong with that. What was wrong is, is that there is no basis in California law for a federal court to infer that California would recognize either a misappropriation, conversion or unfair practices claim for the public performance of the sound recording that there are two cases where the California courts have dealt with this, Heilman and Erickson, and they both involved record piracy. I mean, the pure you take the sound recording, you reproduce it and you sell it either as your own or some kind of small disclaimer, blatant record piracy. And the courts in finding common law liability there recognizing that recognize that there was protection under California law against the reproduction of sound recordings. That was the core of copyright before it was published. And also there was a criminal statute that prohibits anti-piracy. And so the court reasoned and this court picked up a little bit on the Lone Ranger case and said that there we could infer that there would be common law liability or misappropriation or conversion. And here you don't have any of that with respect to the right of public performance. That right has never existed under state law. There's nothing like 653H, the anti-piracy statute that would cover that right. In fact, 653H expressly exempts radio broadcasters. And so there would be there would be no basis to infer that the California courts would recognize this new liability. In fact, the one state court decision that my friend has relied upon in this case, the 2014 interlocutory basis, the court in that case, it was Judge Strobel, she herself refused declined to recognize any common law non-copyright liability for merely publicly performing radio broadcasts. And another reason why there's a difference between piracy and the public performance here is that piracy has always been understood to to take the economic value of the investment in the sound recording that's been made and to profit from that directly by selling it as your own. With public performance, it's exactly the opposite. It's always been understood historically that the public performance, the playing of a song on the on a radio actually adds economic value to it. In fact, for part of our history, until Congress outlawed the practice, radio labels used to pay in order for the radio stations for them to play their songs on the radio, because when people hear the song, they may go out and buy the record. And so that's an economic difference, fundamental difference between piracy and the asserted right that's at issue. Well, piracy is theft. Piracy is conversion by definition. And here you'd have to take a logical leap to get to that. Yes, that's right. And the last thing I would leave you with is a case called Toho Company v. Sears, 645 F. 2nd, 794, which is a case by this court. In that case, in the context of a motion to dismiss, this court declined to infer new rights under common law. At issue in that case was Sears' sale of garbage bags that it called Bagzilla and put a blizzard on the label. And Toho Company, which owned the rights to the Godzilla franchise, brought suit for common law, misappropriation, conversion and the like. And it pointed to the anti-piracy cases Heilman and Erickson and said that akin to that, that when they had used the trademark Bagzilla, which was like Godzilla, that there was copyright, there was common law liability under state law. And this court rejected that argument out of hand, saying there was no similar substantial taking as there was in the anti-piracy cases and no basis for us to conclude that California courts would recognize this new theory. And that's exactly the case here. There's no basis for this court to conclude that California rights would extend the common law to this brand new context. Let me, before you sit down, let me ask a follow up question to one of Judge Friedman's. You know, we all, I mean, it was in the papers and whatnot about the settlement between Flo and Eddie and Sears. I kind of thought that might lead, there might be some settlement talk between Pandora and Flo and Eddie. With respect to Pandora and Flo and Eddie, I mean, we haven't settled it, Your Honor. I mean, we are, you know, asserting our rights and the lack of liability here. I mean, the one, the one other thing I would note about the Sears settlement is they did preserve a right to appeal. Yes, they have a number of contingencies built in the way I read it. Exactly. So the legal issue could be or will be preserved, do you think, under that settlement, as you understand it? Certainly, they preserve the right to appeal it on the underlying legal issues. And they also preserve their rights depending on what happens in this case and other cases around the country. I know that they reserve a right to appeal. Beyond that, Your Honor, we weren't a party to the settlement. All right. All right. Thank you. I'll give you some time for rebuttal. Thank you. Good morning, Your Honors, I think. It's still good morning. And may it please the Court, I'm Henry Gradstein from Gradstein and Marzano. On behalf of the Plaintiff Appellee, Flo and Eddie Inc., aka the Turtles, let me just clear up one thing. I also, we also did the Sirius XM case. Yes, I understand that. And negotiated that settlement. So, yes, the precise bear issue of whether or not there was an infringement as a result of the pure performance without putting other elements in, such as copying, which occurs here in this case, this pure performance will extremely likely be before this court in a case where that is teed up correctly. That's not this case. This case is, let's bring it back to where we start from, and this is here on a slap motion through the back door. And, in fact, it's very important to understand that it's not the kind of slap motion where there had to be a prima facie showing of evidence. It was stipulated and agreed, and it's all over the record, that it's going to be treated like a 12B6 motion, and all of the facts that are alleged in the complaint are admitted to be true, and it's purely a legal defense. But it's important for the court to understand what those facts are, and I'll come back to it, because it's an intertwined set of conduct that doesn't merely implicate the performance issue, but also duplication and distribution. But I think it's important to start from the beginning, because there's been a lot of statements here regarding the law and the history and all that, which just are not correct. So it's important, conceptually, to understand what is the property being protected. And oh, by the way, I'm starting with prong two of the slap. Understood. I'll come back to prong. Understood. But what is the property that's being protected? And the property that's being protected is the artistic performance that was captured as sounds back in the studio in the 60s, and that the transfer of the physical chattel on which those sounds are imprinted doesn't transfer the property right, the interest in the sounds themselves. I mean, that's been on... Who owns those? The sounds are owned by Flo and Eddie, in this particular case, are all of the owners of the recordings. But it's very important to start with that simple concept, because that's from which everything else flows. There is an artistic performance captured as sounds, and there is also a physical medium of storage. And that was, back in the day, tape. Back before that, it was shellac, and then it was tape, and then it was vinyl, and then it was CDs, and now it's digits on a storage device. But sale of the medium of storage, sale of the record, does not transfer ownership of the artistic performance that's indented on that record. I mean, that's been understood, the first, very first case on this point in the entire country was... Well, how about the public, you know, on the radio? I'm sorry? Well, you said the transfer doesn't impair any of the rights, the holder's rights, correct? Correct. But how about when it's... So if I sell the record... Right. How about when it's played on the radio? Yes. If I sell the record, it doesn't give the, under California law, and under any number of decisions that are now in existence, that the sale of the record does not permit the effective usurpation of ownership and exploitation through public performance for profit. Well, let me ask you, so back in the day, so to speak, what did 983 mean? Ah, okay. 983, first of all, 98, I would submit, Your Honor, that 983A never even applied to... Well, I should... 983. I'm talking about 983, not 980. I'm sorry, Your Honor, are you talking about the publication statute? No, 983, not 980, 983. Yeah, back in the day, 983, it's 983A, was, we would submit, didn't even apply to... Yes, because it says, if the owner of a composition and letters are art, is that what your argument is? Actually, that's part of the argument, but the primary argument is, and I can go through the history, publication is a very well-traveled field. And this Court has a decision called ABCO that is an intervening decision that says that the sale of a record is never a publication. So I'll get to that. Well, my question, though, is the broadcasting of the records. All right. So I'm dealing with 983. 983 was intended to respect the dividing line between the Federal jurisdiction once there has been a publication for those rights that are protected by Federal law under copyright, such as a book or a map or a musical work known as a composition, and to respect that dividing line. If you go back all the way into the history, back into the 1870s, it's clear that 983 was to protect against interfering with Federal jurisdiction. That's all? Correct. Well, the words 983 going back into 1874 say, if the owner of a product of the mind intentionally makes it public, a copy or reproduction may then be made public by any person without responsibility to the owner, so far as the law of this State is concerned. Correct. And it's also, there's a note, there's a legislative comment note in there that says, and I wouldn't pull it out exactly, but it says that the dividing line between Federal and State authority has to be respected. And that was the point of that statute. What do you do with the text of the statute, though? Well, so if the owner of a, and then if you take it further, if you bring it up to 1949, if the owner of a composition in letters or art publishes it in the same, publishes it, the same may be used in any manner by any person without responsibility to the owner, in so far as the law of this State is concerned. So what did that mean back when this was in force? So when it was first, obviously when it was first enacted in 1874, it couldn't have applied to sound recordings because sound recordings didn't exist. Right. Back in, and they basically stayed with the same language except what they did is they withdrew the product of the mind and they focused on composition in letters and art. The protection provided for sound recordings didn't exist under Federal law. People didn't even understand, you know, that sound recordings that captured musical performances were themselves independent property. But a sound recording going back to 1908 in the Supreme Court decision of Whitesmith is not considered a copy. It's not considered a copy that's something that can be published. So through to this day, to this Court's decision in the case of Abko, in which it clarified that it has been the understanding of over 100 years of jurisprudence that the sale of a record does not constitute a publication. There never was any Federal law for the State to protect, and that language on its face simply doesn't address the sounds captured on a medium of storage and the property rights in those sounds. Because you can't publish a record. All right, you keep saying sale of a record, and he keeps saying public performance. Are you talking about the same thing or are you talking about two different things? No, no, no, no, no. The argument that is being made by my opponent is that former Section 983A terminated all rights once the records were sold. Okay. And so the sale of the record under 983A constituted a divestive publication. That is incorrect because, number one, first of all, the statute is repealed, and it's of no force and effect as if it never existed. But number two. That's not quite correct because it did exist at some period in time, and it did have some force and effect. And Lone Ranger makes that quite clear. I'll address that and I'll address Lone Ranger if I may. But the first concept is that the sale of a record embodying a musical composition is not a publication. It just isn't. And that's been the understanding through federal and state jurisprudence for 100 years, as this Court said in the Abko decision. In the Abko decision, this Court was taking a look at an amendment to federal legislation which said that and determined whether or not that's always been the law. And Abko said, yes, that's always been the law. The decisions of the prior cases going all the way back to Whitesmith in the Supreme Court through to the case of this Court's case in La Cienega against Zdzislaw, which there was a mistake made by the Court according to the Abko decision in 2000. There was the federal decision in a case called Rosette. I would recommend the Abko decision. But it is the law everywhere that the sale of a record is not a publication. And, therefore, So what is it? It's just a transfer of ownership? No. A sale of a record is a mechanism by which the purchaser of the record can get to listen to the record for private use. It doesn't transfer the sounds. It doesn't transfer ownership in the artistic performance that's indented on it. That's the basis upon which all these other laws are there. If it was the case that So what happens to the used record store? No, they're not duplicating the record. They're not publishing the records. They're not performing it. They have purchased those records, and they are reselling those physical records. And that's okay? Sure, because that's the chattel itself. You can sell the physical chattel that you bought, but you don't have ownership of the sounds that are on that chattel. And that's why you can't make a copy of that. You can't distribute it. And that's why you can't publicly perform it to 200 million users for subscription fees. That's an exercise of dominion and ownership of sounds that you didn't buy. You didn't buy the artistic performance. And that's why this law applies. How do you reconcile what you've just said with the notion that radio stations for years have paid royalties to composers but not to performers? The answer is actually a practical one, and it's essentially at that time people didn't concern themselves with the exploitation financially of the sounds by local terrestrial radio stations because it was their business model to sell physical records. That changed starting the last decade, and as a consequence of services like Pandora and services like SiriusXM and other online services, as a consequence of that, the economic remuneration is no longer existing in the sale of a physical record, but rather the economics now come from exploitation exactly the way Pandora does. And I want to get back to exactly what Pandora does. Yes, but that's a practical argument. As to why nobody raised it. Oh, as to why nobody raised it. In other words, performers, thousands and thousands of performers sat by while record stations played their records and paid the composers and never raised the arguments that you're now raising about how the creative process, we add so much by performing, all of these things which lead to the conclusion that the performer should be paid. Those same arguments existed in the past? Well, not exactly, but the answer is that, first of all, the first case on that did find by the Pennsylvania Supreme Court, they did say that it was improper for the radio station to take an orchestra's records and for 75 cents go ahead and broadcast those records. This Paul Whiteman? No, no, no. Whiteman was, no, this was before Whiteman. It's actually good law in the books. Whiteman said, and Whiteman assumes that there is a public performance right. Otherwise there would have to be, there would be no reason for it to discuss what happens upon sale. But it's, you know, if you keep the record in a drawer, is there any doubt that if someone gets the record and plays it on the radio that that would be an infringement under 980A2, as well as all of the common law that says you can't interfere with the interest in the recording? But Whiteman said, no, we think that the sale of the record ends all common law rights. And then that was determined in a case called Metropolitan Opera in 1950 to be incorrect. And then in 1955, the Second Circuit reversed itself. There is no decision in California, there is no decision in this circuit, that says that the sale of a record embodying a musical composition constitutes a publication, a divestive publication. That's not the law in Florida. There's a case right on point called Waring. It is universally held that the sale of the record does not constitute a divestive publication in the ownership of the sounds. And so what is it that Pandora is doing? Because we're here and we're discussing minimal merit. And I recommend to the court to take a look at the allegations of the complaint. But starting at paragraph 19, we don't say that what they do is they buy a record and then they play that record for 200 million subscribers. We, as must be accepted as true, say that they duplicate the record and they duplicate the record illegally for purposes of putting it on their servers and so on to facilitate their manner of exploiting and monetizing our records. They buy one CD and then they do precisely what was the conduct that was found to be unlawful in Lone Ranger. And that conduct was, in Lone Ranger, a radio announcer bought old Lone Ranger tapes from collectors. So clearly the intangible property right in the sounds is not sold by doing that, but old Lone Ranger tapes from collectors, and then ported it over to a broadcast tape, which is just like Pandora. It goes ahead and it puts it on its servers. So it takes the CD, rips the CD, puts it on its servers, all of which is alleged in the complaint, and then begins, and then Mr. Lewis in the Lone Ranger case starts leasing it to radio stations for public broadcast, which is no different than what Pandora is doing. And he got nailed not for copyright violation, understandably, but for common law misappropriation and whatnot. And we have that in our case, too, in terms of the minimal merit. We have common law misappropriation. We have conversion. Pandora converted the ownership of the sounds for it to be able to exploit it by leasing it to its 200 million users and subscribers, getting paid money from subscribers to play that which it did not own. It had a right for private use to use a CD, but it didn't even do that. It didn't even stick with that. It did exactly what it conceived as illegal, which is it made copies for purposes of monetizing all of this. So it copied, it distributed. We also allege in the complaint that copies are then distributed to the user's computer. All of that is accepted as true for purposes of this motion, and that's the course of conduct, the fabric of conduct that is going to be tried below. And do we have minimal merit? The state court, there is a state court decision. They want to diminish it, but there's a superior court decision in the Capitol Records versus SiriusXM case which says exactly on the point of performance that there is a performance right. That's part of the bundle of ownership of the ownership of the sounds. If you own the sounds, people can't take your sounds and exploit them through 200 That's the whole idea. You can't copy it. You can't duplicate it. You can't exploit it. Let me ask you something. Judge Friedman asked or raised the question of certification to the California Supreme Court. Oh, well, we're not. This is not that case. Why not? Because the bare issue of performance is not teed up in this case at all. Why isn't it? Because our allegations of the complaint are that Pandora makes illegal copies and puts them on its server as part of the whole process. And the decision could come out in our favor. The reason that wasn't the case in SiriusXM is because the servers weren't in California. But the reason that this decision could easily come out in our favor without even analyzing performance standing alone from illegal duplication is because there is illegal duplication or at least as is admitted for purposes of this proceeding. Do you think the way these statutes could be interpreted might have an impact on the outcome of this case? I don't know what I yes, but I don't know exactly what the how the facts are. Given all the litigation that's going on over this issue and even in the state court, I mean, it's really a state law. By the way, Judge Strobel, Judge Strobel, Judge Strobel's decision. Gender diversity, if I'm not mistaken. Judge Strobel's decision, by the way, was taken up on a writ all the way to the California Supreme Court. They sort of explained that in their reply brief that it went up on some, not on the merits of a ruling, but on some other issue. No, it went up on the merits. That's not correct. Well, let me ask you this. If this, if the bare issue of performance is not involved and the issue is illegal duplication, how important is the reading of 988-2 or is this a conversion case? No, 988-2, first of all, 988-2 plainly applies. I mean, the language of 988-2 is very clear. The first two words are the author. Well, the author. The turtles are not the author. Well, actually, the turtles are the author, actually, the author of a sound recording. Do they write the music? No, no. Do they write the lyrics? That's very important, too. We're not talking about the underlying musical work of the composition. What we're talking about that's a protectable property interest are the sounds. They didn't write Happy Together, no. They're the author of the sounds. That's correct. That's what it means, the author of a sound. And the State could not have been clearer that it wanted to protect the exclusive ownership, and it was a grant, it also goes on to say, a grant of rights in the legislative history. The author of the recording fixed prior to 1972 has an exclusive ownership interest in the sounds. It uses the word sounds twice in the statute. In the sounds, as against all others, except somebody who makes a sound alike. And if the legislature, we're talking about this idea of the negative inference of only having one exception. If the legislature wanted, it was clearly paying attention to what was going on with the Copyright Act, and it copied some of the language. But unlike the Copyright Act, when it came to terrestrial radio, it didn't explicitly provide for an exclusion of the terrestrial radio. When the legislature in California had the criminal statute, which is Penal Code 653H, in 1968, it expressly excluded from that the performance by a terrestrial radio. And the legislature is assumed to know its laws. And if it wanted to do anything other than leave it up to the private parties to address their civil rights, it would have said so. It didn't do that. It's unlimited language in that statute, and it's not that big a deal. It's now, now the world has changed, and so let's take a look at what we own. Well, we own the sounds. And if you want to go ahead and sell the sounds to 200 million users, you've got to get a license from us. So let me, let me, what in your, I want to make sure I understand your position. What was the legislature up to when it changed the statute, when it repealed 983? What were they, and revised 980, A1 and A2? What were they trying to accomplish? With respect to 980, A2, the legislature expressly was protecting and granting the rights of the author of the sound recording to the exclusive ownership of those sounds against everybody else. And it simultaneously repealed the prior statute. And it repealed the prior statute at least for the reason that publication was no longer a germane concept in light of the new federal copyright act. But publication was never a germane concept when it comes to the sale of a record embodying sound, embodying musical compositions. There's no such thing. You can't publish a record, a sound recording is not published by its sale. It just isn't. It's not that way anywhere. And it's not published by performing it, by public performance. It's not published by sale to the person who's going to publicly perform it. It's not published. Selling the records, putting it into the stream of commerce does not constitute a publication of that record, whether for purposes of public performance or duplication or distribution. How about when the Turtles appeared at the Hollywood Bowl and played their songs there? Is that public performance or is that, what is that? How does that fit in the scheme of things? It actually doesn't because what that is, it's not a playing of the sound recording. It is a new. It's a performance. They are playing the song. They have to pay. They are playing the song live. They are performing the song live. They are paid for their performance, right? They are paying for the right to use the song, Happy Together, for example. Or they may have written the song, but they are not playing. I know these terms kind of overlap. They are performers, but performance of a recording of the record simply means playing it out loud, playing it out loud in a field, playing it out loud to 200 million subscribers and so on. Whatever it is, that's what it means. It means playing it out loud. In the concert scenario, the Turtles aren't playing. They are recording out loud. They are doing that one thing that is the exception. They get paid for being there that night and performing. And making those sounds similar, but that's not the recording. They are not using the recording. Paid for being on Ed Sullivan in 1967. Correct. And so now in today's world, it doesn't matter. Listen, those rights, the ownership of those sounds on that medium of storage has always been with the Turtles. And it just was the case that now that public performances, the playing records out loud for streaming or for satellite or whatever, that is where the money is. It turns out, and it's not even a close call. Let me ask you another question. That they own it. And all these own it. That's why Pandora paid 90 million to the record companies. Hold on a second. Just hold on one second. I just want to make sure I understand. So, you know, let's go back in the day. Right. The Turtles distribute one of their albums or records. Correct. To all the radio stations. Play this. It's going to be a hit. Well, that's actually not in the record. That's not. Well, I'm just asking you hypothetically. Well, that may be. Hypothetically. That may be. Is that publication? Well, that may well be an implied license. But no. The distribution of a. That's not. That's not. No. There's no. That's not public performance either. Well, no. The playing of the record on the radio is a public performance. And they send it out and say, hey, this is going to be a hit. The question is, does the record, does the radio station in that scenario have to pay for the use of the record? No. And the answer is no. And that's not my question. The question was just, is that a public publication? Is that a public publication? It's not a divestive publication to do that. No. No, it's not. The law is very clear that the sale and distribution of a record embodying a musical composition is not a publication anywhere. That's this case, the Abko decision in 2000 of this Court. Okay. So your view of 983, aside from the view that it's, you know, no longer the law and it shouldn't be relied on and all of that, your view is that the owner, that the performers, the Turtles, when they gave their record, sold their record to radio stations, were not publishing it the way that term was used under 1983? Correct. So 983 had no relevance whatsoever to records being given, sold, comped to radio stations. That is correct. And in 1947, when that statute, 983, was amended, it was explained that they were amending the publication aspect of it, the word publishes from makes it public, to bring it exactly in line with the authorities throughout the country, including federal authority, whether or not, in a technical sense, something is a publication. And performance, in a technical sense, is not a legal publication. And all of that was ultimately clarified in the Abko decision of this Court, looking at the history. And there's 100 years of jurisprudence, which basically says you can't sell a record. Selling a record doesn't publish it. It's not in the technical legal sense. It is considered to be a performance, a captured performance. Okay. So the author or proprietor of a composition, meaning someone like the Turtles, under 980, has an exclusive ownership. But under 983, the same author or owner of the composition is not publishing it when it gives it or sells it or comps it to a radio station. Well, the recording is not a composition. So there's no relationship. They're not owners of the composition. So there was no relationship ever between 980 and 983? The original 980 that talked about ‑‑ let's not talk about records for a minute, because there's a serious ‑‑ By 1949, we had records. Well, certainly, but the idea of what was protected as encompassing sound recordings, one, because of the fact that you can't publish a sound recording, and two, because of the fact that they didn't really understand what the protectable nature of it was. So the first law, statute, really, that protected sound recordings was 653H, which made it criminal to go ahead and duplicate those without a license or consent. And then there were, at the same time, a number of cases that talked about the intangible property interest in the sounds. Not one of them, Heilman, Erickson, the Supreme Court's decision in a case called Goldstein v. California, Lone Ranger, not one of them actually talked about it in terms of it being protected under the former section 980. People didn't think about those terms as applying. It never was raised, and yet it was found to be a protectable interest under common law. Because it's not ‑‑ because the Turtles don't own the composition, which is happy together. The Turtles own the sounds that are indented. And those sounds that are indented, you really have to kind of do a stretch to say that that's what those old statutes were about. But they're all gone. We've got a clear statute, 980A2, which says the owner of the sounds has an exclusive ownership against everybody else. Period. The old statute's gone. That's the law today. Okay. Thank you, Your Honors. Over your argument. Way over your argument. So I'm going to give the other side a little bit for rebuttal. I could go another three, four hours. No, that's okay. It looks like you're very, very passionate about your position. Two. Thank you, Your Honors. With respect, everything we've just heard is a radical reconception of the way the world has worked since the advent of radio. And I think it's clear from my friend's submission today that all of his arguments with respect to Pandora would apply to terrestrial radio as well. And yet we know that since the advent of radio, terrestrial radio, we've never had royalties on sound recordings. Now, the arguments that you've heard with respect to publication and what that means in 983 were briefed and answered in the Lone Ranger case. And so that's a complete stop. This Court is bound by that panel. There's no basis for revisiting the Court's interpretation in that case, which recognized a sensible conclusion that when you commercially disseminate sound recordings to the public, you've published them. And then under the language of 983, which couldn't have been more clear, the public may use them in any manner by any person. How do you respond to his ‑‑ just let me make sure I understand your position. How do you respond to his ‑‑ counsel's argument about the author, what would stake here as the authorship of the sounds? Well, it gets to, ultimately, to the public performance right. I mean, the sound recording is the right to perform them over the radio, that we've infringed that right. They have the right, the exclusive right, to take that sound recording and to play it. I mean, that's what the heart of their claim is. And that right simply has never existed. When federal law in 1971, for the first time, recognized protection for sound recordings, it was explicitly protection against the reproduction and not public performance right. But under my friend's submission, the Federal Copyright Act of 1971 drastically curtailed the rights that existed under California law, because under their view, they had the right to public performance, and that was preempted by the Federal Act. That never happened. Of course it never happened, because California law has never recognized a public performance right. If I could make a couple of other points. Go ahead, and then we'll have to end. Make your points, and then we'll end the session. With respect to the state court decision, Judge Strubel's decision, she didn't consider publication. Her tentative decision was initially that exclusive rights didn't confer a right to public performance, but then she changed that on the basis of the SiriusXM decision. But that was based on the interpretation that can't be right in light of this Court's decision. By the way, what's the status of that case? That case has ended. I believe that case has settled as well. With respect to the anti-SLAPP, Your Honor, this case implicates the very heart of the anti-SLAPP statute. In fact, Pandora actually has taken down Turtle Songs. It is restricted act. It no longer plays Turtle Songs because of this litigation, and therefore the public doesn't have access to them by virtue of this litigation. This Court can and should make the legal determination that the rights that they are asserting don't exist as a matter of California law, and at a minimum were lost when they were clearly published by being commercially distributed. And finally, with respect to certification, of course at the bare minimum this Court should certify the state law issues to the California Supreme Court, but we don't think that the Court needs to do so because, among other things, unlike the Second Circuit case and the other cases in which these issues have been certified, this Court has binding law that governs this panel on the interpretation of state law. They made the decision to file this case in federal court. The federal courts are bound by this Court's decisions, and those decisions, including with respect to 983, control the interpretations in this case and require the reversal of the decision below.  Thank you, Your Honor. Thank you. We've given you plenty of time, and we appreciate your arguments, and the matter is submitted.
judges: Reinhardt, Paez, Friedman